**MENDES JUNIOR INTERNATIONAL COMPANY, Plaintiff,**

v.

**Banco Do BRASIL, S.A. and BB–Leasing Company, Defendants.**

**No. 96 CIV. 6584(RLC).**

United States District Court, S.D. New York.

June 29, 1998.

Thacher Proffitt & Wood, New York, NY, for Plaintiffs; Joel B. Harris, Jill Hertz Ashman, Erik D. Klingenberg, of counsel.

Wang and Wang, San Francisco, CA, for Defendants; Francis S.L. Wang, of counsel.

### OPINION

ROBERT L. CARTER, District Judge.

This action arises from an alleged breach of contract between plaintiff construction company and defendant bank and its subsidiary which financed some of the plaintiff's projects. Plaintiff's action is for a declaratory judgment, promissory estoppel, and over $800 million in damages based on the defendants' alleged breaches of contract, breaches of fiduciary duty, and failure to perform various obligations in a commercially reasonable

manner. Defendants now move to dismiss plaintiff's suit based on the doctrine of forum non conveniens, lack of subject matter jurisdiction pursuant to Rule 12(c)(1), F.R. Civ. P., lack of personal jurisdiction pursuant to Rule 12(b)(2), F.R. Civ. P., and failure to state a claim pursuant to Rule 12(b)(6), F.R. Civ. P.

## I. Introduction

Plaintiff Mendes Junior International Company ("Mendes") is an international construction company which designs and builds, *inter alia*, railroads, highways, airports, and hydro-electric power plants. (Complaint at 3). It is a Cayman Islands corporation whose principal place of business is Belo Horizonte, Brazil. *Id.* Defendant Banco do Brasil, S.A. ("Banco") is a Brazilian commercial bank whose principal place of business is Rio de Janeiro, Brazil. *Id.* Co-defendant BB–Leasing Company LTD ("BB–Leasing") is a subsidiary of Banco in the commercial leasing business and conducts business out of its New York offices. *Id.* at 4.

In the 1970's, Banco agreed to finance several of Mendes' construction projects in Iraq. In 1986, Banco refinanced Mendes' debts through a sale lease back transaction (the "Lease") with BB–Leasing. The Lease provided for Mendes to sell its construction equipment to BB–Leasing for a nominal sum. Mendes was then required to pay back the debt through monthly lease installment payments. (Def.'s Mem. of Law at 4).

In July of 1989, financial disputes with the Iraqi government over missed payments to Mendes led to the creation of an assignment agreement (the "Assignment Agreement") between Mendes and Banco. Under the terms of this agreement, Mendes assigned its payment claims against Iraq to Banco. (Pl.'s Mem. of Law at 6). Petrobras, the parent of Mendes' partner in the construction projects, was then designated as the entity that was to attempt to negotiate with the Iraqi government for payment of the debts owed to Mendes. (Def.'s Mem. of Law at 5).

Banco and Mendes subsequently entered into another agreement on October 14, 1989, pursuant to which Banco loaned Mendes an additional $45 million for the Iraqi construction projects. (Pl.'s Mem. of Law at 3). As a condition to the refinancing, Banco required Mendes to obtain a special insurance policy from Instituto Resseguor do Brasil ("IRB") that would provide full repayment to Banco if Mendes became unable to do so. *Id.*

Iraq's invasion of Kuwait and the subsequent United Nations embargo of Iraq exacerbated Mendes' contractual difficulties with the Iraqi government. Unable to extract payments from Iraq, Mendes defaulted on its loan repayment obligations to Banco. (Def.'s Mem. of Law at 6). Banco then brought suit against Mendes in Brazil to collect the defaulted loan amounts. (Def.'s Mem. of Law at 6). That litigation is still pending.

Mendes brought the instant action against Banco and BB–Leasing in New York State court for defendants' alleged failure to enforce the insurance policy or to collect the payments due from Iraq. Mendes claims that defendants' wrongful acts and omissions caused its operating income to decline from approximately $1.2 billion in 1986 to under $270 million in 1995. (Pl.'s Mem. of Law at 4). Mendes seeks compensation for its monetary damages as well as a declaration that it is not required to repay the Loan, the Lease, or any other financial obligation to Banco. (Pl.'s Mem. of Law at 4). Defendants removed the case to federal court pursuant to 28 U.S.C. § 1441(d) [1] and now seek its dismissal.

## II. Plaintiff's Claims

Plaintiff's first claim is that Banco breached its obligations to Mendes under the Lease and the 1989 Loan by failing to pursue repayment under the IRB insurance policy.

---

**1.** This is a civil action brought against a foreign state as defined in 28 U.S.C. § 1603(a). Banco is a separate legal person in the form of a corporation and a majority of Banco's shares or other ownership interest is owned by the government of the Federative Republic of Brazil, or a politi- cal subdivision thereof. In addition, Banco is neither a citizen of a State of the United States nor created under the laws of any third country, but is duly incorporated in and under the laws of Brazil. Thus, this court has original jurisdiction under 28 U.S.C. § 1330(a).

(Compl. at 13, 14). Plaintiff's second cause of action is that the Bank breached its obligations under the Assignment Agreement by failing to pursue Mendes' claims against Iraq. *Id.* at 14. Plaintiff's third cause of action is that Banco's alleged failure to pursue claims against Iraq and IRB also constituted a breach of its fiduciary duties to Mendes. *Id.* at 15.

Plaintiff's fourth cause of action is that, due to Banco's alleged promises to obtain payment from Iraq and consequent failure to make reasonable attempts to do so, Banco should be estopped from demanding repayment of any of Mendes' obligations to the bank, including the Lease. *Id.* at 16. Similarly, plaintiff's fifth cause of action states that Banco's failure to use reasonable efforts to collect the proceeds from the IRB policy warrants Banco being estopped from obtaining repayment of any alleged obligation of Mendes, including, but not limited to, the Lease and the 1989 Loan. *Id.* at 17.

Plaintiff's sixth and seventh causes of action are for alleged breaches of a duty of good faith. *Id.* at 17, 18. Specifically, plaintiff claims that the Lease and 1989 Loan are governed by New York State law which means that each contract contains a covenant of good faith and fair dealing and imposes an obligation of good faith in the contract's performance and enforcement. *Id.* Plaintiff claims that Banco's failures to use reasonable efforts to collect the amounts due to Mendes from Iraq and under the IRB insurance claim constitute a breach of Banco's duty of good faith. *Id.*

Plaintiff's eighth cause of action is a claim that Banco breached its duty under New York law to act in a commercially reasonable manner with respect to the collateral for the Lease and the 1989 Loan. *Id.* at 18, 19. In particular, plaintiff alleges that Banco's failure to collect the insurance proceeds from the IRB policy was a breach of its duty to exercise commercial reasonableness in connection with the Lease and the 1989 Loan. *Id.*

In addition to a declaratory judgment, plaintiff seeks over $800 million in damages. *Id.* at 19, 20.

X Defendants now move to dismiss plaintiff's suit based on the doctrine of forum non conveniens, lack of subject matter jurisdiction pursuant to Rule 12(c)(1), F.R. Civ. P., lack of personal jurisdiction pursuant to Rule 12(b)(2), F.R. Civ. P., and failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), F.R. Civ. P.

### III. Analysis

Before undertaking forum non conveniens analysis, the court must address defendants' argument that plaintiff's entire complaint should be dismissed because the Assignment Agreement contains a forum selection clause mandating that litigation arising therefrom be adjudicated in Brazil. (Def.'s Mem. of Law at 12). The forum clause in question, Clause Ten of the Assignment Agreement, states: "[Mendes] and [Banco] herewith agree to submit any disputes arising out of this present Agreement of Assignments to the courts of Brasilia." (Assignment Agreement at 7). According to defendants, this clause encompasses plaintiff's entire complaint and requires its transferal to the courts of Brazil.

Plaintiff urges the court not to enforce the forum selection clause in the Assignment Agreement since it is "insignificant" and "collateral" to the Lease and Loan agreements, neither of which contain a mandatory Brazilian forum selection clause and which were, according to plaintiff, the primary agreements at issue in this law suit. (Pl.'s Mem. of Law at 16). According to plaintiff, the Assignment Agreement merely was "executed in furtherance of the Bank's efforts to collect payments under [the Lease and Loan] agreements." *Id.* Plaintiff relies upon this court's decision in *Anselmo v. Univision Station Group, Inc.,* No. 92 Civ. 1471, 1993 WL 17173 (S.D.N.Y. January 15, 1993) (Carter, J.), to support its proposition that courts can and have refused to enforce forum selection clauses that are insignificant to the main controversy.

■ Contrary to plaintiff's first assertion, the Assignment Agreement does not appear to be "collateral" to the entire complaint. Plaintiff relies solely on the Assignment Agreement to set forth its second cause of

action alleging that defendants unlawfully failed to pursue Mendes' claims against Iraq and inflicted in excess of $800 million in damages against Mendes. In addition, plaintiff's third, fourth and sixth causes of action for breach of fiduciary duty, breach of good faith, and promissory estoppel, respectively, are either partly or entirely based upon Banco's alleged failure to pursue Mendes' claims against Iraq pursuant to the Assignment Agreement. Therefore, the court finds the Assignment Agreement to be integral to plaintiff's complaint.

Plaintiff's second assertion, that this particular forum selection clause can be ignored, is also flawed. Even if the Assignment Agreement were "insignificant" to the Loan and Lease Agreements, plaintiff's reliance on *Anselmo* to dispel the power of the forum selection clause would be unfounded. In *Anselmo,* defendant moved to dismiss plaintiff's claims pursuant to a forum selection clause that only governed some of the plaintiff's claims. While this court recognized that "[c]ourts in other jurisdictions have refused to dismiss or transfer a case which is broader than the forum selection clause," it also found that "most all of these cases [from other jurisdictions] involved additional defendants not bound by the forum selection clause and RICO and state law fraud claims which if successful would invalidate the contract containing the clause." *Anselmo,* 1993 WL 17173, *3, citing *Farmland Industries, Inc. v. Frazier–Parrott Commodities, Inc.,* 806 F.2d 848, 852 (8th Cir.1986); *General Environmental Science Corp. v. Horsfall,* 753 F.Supp. 977, 980 (E.D.Mich.1987). Thus, these courts did not refuse to enforce forum selection clauses because they were insignificant to the main controversy but rather because additional parties were involved who were not bound by the clause and because non-forum bound claims could have impacted the validity of the forum clause itself.

■ The court in *Anselmo* found that all of plaintiff's claims could be transferred pursuant to a forum agreement clause even though some of the claims were not governed by the forum selection clause. 1993 WL 17173, *3. Moreover, the United States Supreme Court has held that a forum selection clause "is prima facie valid and should be enforced unless enforcement ... [would be] so manifestly and gravely inconvenient to [the moving party] that it will be effectively deprived of a meaningful day in court." *The Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 19, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). Therefore, the Assignment Agreement's forum is valid and applies to those of plaintiff's claims "arising out of this present Agreement of Assignments." (Assignment Agreement, Clause 10).

Thus, the court finds that plaintiff's second cause of action alleging that Banco breached its contract with Mendes by failing to pursue Mendes' claims against Iraq pursuant to the Assignment Agreement "arises out of" the Assignment Agreement and, therefore, properly should be adjudicated in Brazil. Likewise, plaintiff's sixth cause of action, that the Lease and Loan agreements imposed a duty on Banco to exercise good faith in pursuing Mendes' claims against Iraq, is premised upon Banco's assuming responsibility for pursuing those claims through the Assignment Agreement and also should be adjudicated in Brazil.

Plaintiff's third cause of action will remain intact to the extent that defendants allegedly assumed fiduciary duties to Mendes through it's "all encompassing role as [Mendes'] lender, guarantor, advisor, negotiator, agent and joint venturer in the Iraqi construction Projects." (Complaint at 15). Any alleged assumption of fiduciary duties under the Assignment Agreement should be evaluated by a Brazilian court.

Plaintiff's fourth cause of action for promissory estoppel is based upon plaintiff's averment that defendants had "a fiduciary and/or contractual obligation to obtain payment of the amounts owed to [Mendes] by Iraq." For purposes of analysis, this cause of action will remain in place to the extent that the fiduciary and contractual duty do not implicate the Assignment Agreement.[2]

2. As discussed earlier, not all of plaintiff's fiduciary duty claims rested upon the Assignment Agreement. Furthermore, an alternative contractual basis for this claim is Banco's advancement of $45 million to plaintiff.

Defendants next jurisdictional argument is that the forum and choice of law clauses in the Loan and Lease agreements "do not provide any contractual basis to sue defendants in New York." (Def.'s Mem. of Law at 14). Instead, defendants claim that the agreements allow only Banco and BB–Leasing, respectively, the right, at their option, to sue Mendes in New York, and that only Mendes submitted to the jurisdiction of New York courts for purposes of any such suit. *Id.* Moreover, defendants claim that the jurisdiction detailed by the Loan and Lease agreements is non-exclusive, and that the election is left solely with Banco and BB–Leasing as to whether to bring legal action in New York or Brazil.

■ Defendants' arguments concerning the forum and choice of law clauses in the Loan and Lease Agreements are inconsequential. Even if defendants arguments were correct that the Lease and Loan Agreements do not provide any contractual basis to sue defendants in New York, such contracting is not requisite for plaintiff to bring a suit. Defendants' contacts with New York (which have yet to be determined), even if minimal, may establish personal jurisdiction by this court if the "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Indeed, plaintiff does not contend that any of the Agreements grant it a "contractual basis" to sue defendants. Instead, plaintiff contends that the Agreements' reliance on New York laws demonstrates a local interest in the instant litigation. (Pl.'s Mem. of Law at 18, 19). Therefore, defendants' second jurisdictional argument fails and the court now turns to defendants' first motion.

*A. Forum Non Conveniens*

■ The common law doctrine of forum non conveniens permits a court to decline to exercise jurisdiction when it could be more conveniently exercised by another court. The "central purpose" of a forum non conveniens analysis is to determine where trial will be convenient and will serve the interests of justice. *R. Maganlal & Co. v. M.G. Chemi-*

*cal Co., Inc.*, 942 F.2d 164, 167 (2d Cir.1991). Such analysis requires the court to consider: 1) the plaintiff's choice of forum; 2) the adequacy of an alternate forum; 3) private interest factors; and 4) public interest factors. *Id.*

■ It is well settled under forum non conveniens doctrine, that the plaintiff's choice of forum should rarely be disturbed. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). While the United States Supreme Court has held that a plaintiff's choice of forum is not given substantial deference by courts when the plaintiff is foreign, *Piper Aircraft Co.*, 454 U.S. at 256, 102 S.Ct. 252 ("the presumption in favor of the plaintiff's forum choice [applies] with less than maximum force when the plaintiff or . . . real parties are foreign."), the Second Circuit has tempered this holding with its own determination that, "when a treaty with a foreign nation accords its nationals access to our courts equivalent to that provided American citizens, identical forum non conveniens standards must be applied to such nationals by American courts." *Blanco v. Banco Indus. de Venezuela, S.A.*, 997 F.2d 974, 981 (2nd Cir.1993). Brazil and the United States have such a treaty guaranteeing Brazilian citizens access to United States courts equal to that of United States citizens. (*See*, Treaty with Brazil, Dec. 12, 1828, U.S.-Brazil, art. XII, 8 State. 390, 392). Accordingly, plaintiff's choice of forum will be given deference and traditional forum non conveniens analysis will apply.

■ After the weight given to plaintiff's choice of forum is established, the court must determine the adequacy of the alternative forum proposed by defendants which is, in this case, Brazil. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 506–507, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). Plaintiff contends that Brazil is an inappropriate forum because: 1) Brazilian law does not recognize claims for breach of the duty of good faith and fair dealing or breach of the duty of commercial reasonableness; 2) a Brazilian court would have difficulty applying New York law due to the need for translation and unfamiliarity with common law and lender liability issues; and 3) Brazilian courts would not afford plaintiff the

right to conduct meaningful discovery. (Pl.'s Mem. of Law at 10–11).

Defendants argue that the best proof that Brazil is an adequate alternative forum is that Brazilian courts are in the process of adjudicating similar issues to those found in the instant suit. (Def.'s Mem. of Law at 17.). However, the Brazilian lawsuits in question were brought by Banco against the guarantors of Mendes' debts and do not name Mendes as a party. (*See* Chaves Decl. at 3, 4). Therefore, these suits are irrelevant to determining Brazil's suitability as an alternative forum since the relevant balancing factors considered in determining the proper forum have yet to be weighed by this court.

Nevertheless, defendants' remaining arguments concerning Brazil's suitability as a forum are persuasive. Specifically, defendants argue that both Mendes and Banco are headquartered in Brazil and that Mendes stipulated in the Assignment Agreement and in the Loan Agreement that litigation arising from these agreements must or could be brought in Brazil, respectively. Furthermore, other American courts have recognized Brazil to be an adequate forum, including for reasons of discovery which plaintiff expresses as a concern. *See Manela v. Garantia Banking, Ltd.*, 940 F.Supp. 584, 591 (S.D.N.Y.1996) (Kaplan, J.) ("The unavailability of U.S.-style document discovery is far from dispositive on the issue of the adequacy of a Brazilian forum"); *see also Scottish Air Int'l v. British Caledonian Group, PLC*, 81 F.3d 1224, 1234 (2d Cir.1996) ("[S]ome inconvenience or the unavailability of beneficial litigation procedures similar to those available in federal district courts does not render an alternative forum inadequate.") Finally, plaintiff recognizes that Brazilian courts could apply New York law, albeit with difficulty due to unfamiliarity. (See Pl.'s Mem. of Law at 11).

Since plaintiff agreed to Brazilian jurisdiction in its Assignment Agreement and Loan contract with defendant, the court discounts plaintiff's contentions that "it would be far less convenient and efficient for a Brazilian court to handle this case than [an American court]." Such hurdles were foreseeable at the time contractual agreements were formed and are not so insurmountable as to hamstring the litigation. *See The Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 16, 92 S.Ct. 1907, 32 L.Ed.2d 513 ("where it can be said with reasonable assurance that at the time they entered the contract [plaintiffs and defendants] were parties to a freely negotiated private international commercial agreement [and] contemplated the claimed inconvenience, it is difficult to see why any such claim of inconvenience should be heard to render the forum clause unenforceable."). Accordingly, Brazil is determined to be an adequate alternative forum for this litigation.

Plaintiff's remaining claims must be weighed according to their private and public interest factors. A court weighs these factors to decide whether the facts "(1) establish such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative and legal problems." *Koster v. Lumbermens Mut. Casualty Co.*, 330 U.S. 518, 524, 67 S.Ct. 828, 91 L.Ed. 1067 (1947) (companion case to *Gilbert*); *see also ACLI Int'l Commodity Services, Inc. v. Banque Populaire Suisse*, 652 F.Supp. 1289, 1292 (S.D.N.Y.1987) (Lasker, J.). Dismissal based on the balancing of these factors is within the broad discretion of the district court. *Maganlal*, 942 F.2d at 167. The moving party bears the burden of proving that the balance of convenience tilts strongly in favor of trial in the foreign forum. *Id.*

### 1. Private Interest Factors

As enumerated in *Gilbert*, the controlling private interest factors include: (1) the ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling witnesses; (3) the cost of obtaining attendance of willing witnesses; (4) practical problems involving the efficiency and expense of a trial; (5) enforceability of judgments; (6) administrative difficulties flowing from court congestion; and, (7) imposing jury duty on citizens of the forum. *Gilbert*, 330 U.S. at 508–09, 67 S.Ct. 839. *See also Allstate Life Ins. Co. v. Linter Group*

*Ltd.,* 994 F.2d 996, 1001 (2d Cir.), *cert. denied,* 510 U.S. 945, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993).

Defendants argue that all the parties are companies that are either located in or whose major place of business is Brazil. (Def.'s Mem. of Law at 20). Defendants also contend that other potential parties and witnesses mentioned in the complaint—IRB, Petrobras Comercio Internacional, S.A. ("Petrobras")—are primarily situated in Brazil, as is, of course, Brazil's government. *Id.* According to defendants, the location of these various entities' headquarters, operations and facilities, managing officials and the bulk of employees, evinces the efficacy of pursuing litigation in Brazil since witness availability and evidence production would be easier. (Def.'s Mem. of Law at 21, 22). Furthermore, defendants argue that this court would have no jurisdiction or subpoena power over these non-parties, either for depositions or trial testimony.

The additional parties cited by defendants who are mentioned in the complaint—IRB, Petrobras, the Brazilian government—are not parties to this action and their locale has little bearing on analyzing defendants' forum non conveniens claim. Furthermore, the Lease documents were drafted in New York and both the Lease and Loan are subject to New York law. (*See,* Loan Agreement § 25; Lease Agreement § 28). Moreover, Mendes made payments to BB–Leasing, whose offices are in New York, through the New York branch of Banco. (Pl.'s Mem. of Law at 5). Therefore, the instant litigation's connection to New York is not as insignificant as defendants portray.

Furthermore, the distance between New York and Brazil is not so great that witnesses in Brazil would have difficulty in reaching this forum. Modern transportation and communication as well as the possibility of taking testimony where witnesses are located weaken defendants' arguments concerning cost. *Lehman v. Humphrey Cayman, Ltd.,* 713 F.2d 339, 343 (8th Cir.1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 708, 79 L.Ed.2d 172 (1984). *See also, Calavo Growers of California v. Generali Belgium,* 632 F.2d 963, 969 (2d Cir.1980) (Newman, J.,

concurring). Mendes and Banco have done business through New York channels; the cost of litigation through the same channels is a concomitant burden of the global economy. Accordingly, the geographical location of witnesses does not significantly detract from the feasibility of proceeding with this case in New York.

In regards to defendants concerns about this court's subpoena power reaching Brazil, defendants have not identified any potential witnesses who would be unwilling to testify and, thereby, trigger the need for issuing subpoenas. Bare allegations by movants who carry the burden of proof on this motion are insufficient to tip the balance of convenience in their favor. *Cf., O'Brien v. Goldstar Technology, Inc.,* 812 F.Supp. 383, 387 (W.D.N.Y.1993) (party seeking to transfer case on ground that witnesses are unwilling or unable to testify must prove that such witnesses are in fact unwilling to testify and indicate what the substance of their testimony would be).

Defendants also claim that the expense of translating documents and interpreting for non-English speakers would escalate litigation costs unreasonably. Specifically, Defendants allege that "[a]lmost all of the records and material documents are in Brazil, as are virtually all of the persons who would be witnesses." (Def.'s Mem. of Law at 21). Defendants further assert that the majority of documentary evidence is in Portuguese. *Id.* at 22. Defendants estimate that at least 30 witnesses will be deposed and/or testify in this trial, many of whom, according to defendants, do not speak English.

Plaintiff counters each of defendants' allegations with allegations of its own. Specifically, plaintiff disavows defendants' estimation of 30 witnesses with its own estimation of five or six. (Affidavit of Dr. Mendes, dated February 5, 1997 ("Mendes Aff.")). Plaintiff claims that most witnesses speak English and that a fair number of them reside in the United States. (Pl's Mem. of Law at 6). In such a war of assertions unsubstantiated by evidence, plaintiff prevails due to defendants burden, as moving party, to present strong evidence in their favor. Furthermore, while the amount of

documentation is indeed large,[3] it is not so voluminous for the cost of translation or of transportation to warrant dismissal under forum non conveniens, especially since the Lease and Loan agreements, two of the primary contracts in issue, are already in English. Moreover, Portuguese is not so obscure a language as to render translation prohibitively difficult. *Manela,* 940 F.Supp. at 594. Indeed, Mendes is even willing to share the expense of translating additional documents. (Mendes Aff. at 6).

In sum, while the private interest factors do not weigh strongly in favor of either party, defendants, as movants, have not demonstrated that the balance of convenience among private interest factors tips "strongly" in favor of dismissal. *Maganlal,* 942 F.2d at 167.

### 2. Public Interest Factors

■ As established by *Gilbert,* the public interest factors that courts should consider under forum non conveniens analysis are the local interest in having controversies decided at home, and the avoidance of unnecessary problems in the application of foreign law. *Gilbert,* 330 U.S. at 508–09, 67 S.Ct. 839. Defendants' arguments under these factors are substantially stronger than those made under private interest factors and warrant dismissal of plaintiff's claims under the doctrine of forum non conveniens.

Defendants' primary argument in this regard is that Brazil's "local" interest in this litigation is exceedingly high since the national government promoted and engineered Mendes relationship with Iraq in order to secure a reliable source of oil imports. (Def.'s Mem. of Law at 24). Defendants' argument is well-supported by plaintiff's own complaint.

According to plaintiff, Mendes' relationship with the Iraqi government was first initiated because "Brazil actively sought to expand its trading relationship with Iraq in order to ensure that its oil needs were met and to help solve its currency problems." (Complaint at 4). Accordingly, Brazil and Iraq

established a type of barter system in which oil was traded for goods and services. *Id.* As one aspect of this relationship, Petrobras, the trading subsidiary of Brazil's national oil company, formed a joint venture with Mendes to build a railroad in Iraq. *Id.* at 4, 5. Thus, Mendes became incorporated into a national economic policy established by the Brazilian government to facilitate trade with Iraq. The Brazilian government even negotiated directly with Iraq when difficulties arose in Mendes performance of the original contract. *Id.* at 6. These negotiations led to an agreement among Brazil, Iraq and Mendes "that required Iraq to make certain payments and assign additional construction projects to [Mendes] as compensation for the additional costs it had incurred due to the Iran/Iraq War." (Complaint at 6).

The importance of Mendes' contract with Iraq to Brazil's economy is emphasized throughout plaintiff's complaint. For example, the complaint states that, "the government of Iraq advised the government of Brazil that [Mendes'] performance of its obligations under the various construction contracts was essential to Iraq's continued trade relations with Brazil." (Complaint at 7). The complaint also states that Banco agreed to refinance the original loans to Mendes because Banco "knew that [Mendes'] continued performance of the contracts was critical to Brazil's economy." *Id.* These contracts were so important to Brazil's economy that, according to plaintiff, the Brazilian government negotiated the creation of the Assignment Agreement in order to continue Banco's support of Mendes' contract. *Id.* at 9.

Once the Persian Gulf War began and Iraq's payments irrevocably ceased, the complaint claims that, "the [Brazilian] government decided that, due to [Mendes'] important role in Brazil's international trade relations, its debts to [Banco] would be absorbed by the National Treasury." (Complaint at 12). Unfortunately for Mendes, a new Brazilian administration that took office

---

**3.** Approximately 1,500 pages as estimated by both defendants and plaintiff. (See, Mendes

Decl., at 6; Chaves Decl. at 4).

in 1995 decided against carrying out this decision. *Id.*

The court finds that the Brazilian government's instigation and facilitation of the entire Mendes–Banco–Iraq relationship evinces a puissant local interest in the outcome of this litigation, especially considering that Banco itself is majority-owned by the Brazilian government. While New York has a "strong interest in ensuring the uniform application of its laws to financial transactions governed by them" (Pl.'s Mem. of Law at 5), Brazil's national interest in formulating and maintaining its foreign trade policy weighs more heavily and tips the scales in favor of a determination that the litigation should be adjudicated in Brazil.

Moreover, the Assignment Agreement clause already requires that several parts of plaintiff's claims be adjudicated in Brazil. Instead of sending these claims piecemeal to another forum, the interests of judicial economy are best served by maintaining the suit was one complete package. Accordingly, plaintiff's claims are dismissed in their entirety under forum non conveniens grounds. However, the complaint is dismissed on the conditions that: 1) the courts of Brazil have jurisdiction to adjudicate the claims asserted herein; 2) the defendants appear generally in any action asserting the present claims filed against it by plaintiff in Brazil; and 3) the defendant waives jurisdictional defenses as well as any statute of limitations defense it did not have at the time this complaint was filed. *See Danser v. Firestone Tire & Rubber Co.,* 86 F.R.D. 120, 124 (S.D.N.Y.1980) (Duffy, J.).

This course is appropriate since forum non conveniens dismissals are often conditioned to protect the party opposing dismissal. *Blanco,* 997 F.2d at 984; *see also, Maganlal,* 942 F.2d at 167 (defendant agreed to dismissal conditioned upon submission to jurisdiction of foreign court); *In re Union Carbide,* 809 F.2d 195, 203–04 (2d Cir.1987) (affirming district court's dismissal on condition that defendant consent to personal jurisdiction and waive statute of limitations defenses in foreign forum).

### IV. Conclusion

Upon weighing the public and private factors, the court finds that Brazil's interest in this litigation's outcome far exceeds the interest held by New York. In its quest to increase and improve trade between Brazil and Iraq, the Brazilian government promoted, nurtured, and protected Mendes' relationship with Iraq for almost twenty years. Brazil's local interest minimizes that of New York which, according to plaintiff, stems primarily from a desire to further New York's status as "the preeminent commercial and financial nerve center of the Nation and the world." (Pl.'s Mem. of Law at 19).

A plaintiff's choice of forum may be overturned when "the balance of [relevant considerations] is strongly in favor of the defendant." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). This is one such case. Plaintiff's claims are dismissed pursuant to the previously stated conditions.

**IT IS SO ORDERED.**